## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DORED SHIBA,                               )
                                           )
                                           )
            Plaintiff,                     )
                                           )          No. 18-cv-00914
      v.                                   )
                                           )          Judge Martha M. Pacold
ALEJANDRO MAYORKAS, Secretary,             )
Department of Homeland Security,           )
                                           )
            Defendant.                     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Dored Shiba brings this suit under the Rehabilitation Act and Americans with Disabilities Act against Defendant Alejandro Mayorkas[1] in his official capacity as Secretary of the Department of Homeland Security ("DHS"). [37].[2]  The suit relates to two different positions, each with a different sub-agency of DHS.  First, Shiba was employed for approximately seven years as an Immigration Information Officer (IIO) with United States Citizenship and Immigration Services (USCIS, a sub-agency within DHS), but was ultimately terminated from his position with USCIS.  Later, Shiba was tentatively selected for a different position, Enforcement and Removal Assistant (ERA) with Immigration and Customs Enforcement (ICE, a different sub-agency within DHS), but ICE ultimately rescinded the offer.

Shiba brings four disability-discrimination claims against DHS.  The first three claims relate to Shiba's employment at USCIS as an IIO.  In these claims, Shiba contends that DHS discriminated against him and failed to accommodate his disabilities, created a hostile work environment, and retaliated against him by firing him from the USCIS job.  The fourth claim relates to Shiba's tentative selection for the ERA position with ICE and ICE's subsequent rescission of the offer;

---

[1] Secretary of Homeland Security Alejandro Mayorkas is automatically substituted for the former office holder named as a defendant and sued in his official capacity.  Fed. R. Civ. P. 25(d).

[2] Bracketed numbers refer to docket entries and are followed by page and / or paragraph numbers.  Page numbers refer to the CM/ECF page number.

in that claim, Shiba contends that DHS retaliated against him by not hiring him for the position with ICE.

The Secretary moves for summary judgment on various grounds. [61], [62]. For the reasons below, the motion is granted.

## BACKGROUND

The following background is based on plaintiff's response to defendant's statement of facts, [67], which includes the statements and the responses in one document. (Defendant also filed a reply to plaintiff's response to defendant's statement of facts, [73], which the court has reviewed and considered, but the court focuses primarily on plaintiff's response, since that document illuminates any disputes of fact.)

The court first provides a high-level summary and then a more detailed discussion of the facts.

## I.  Summary

Shiba was employed by the Department of Homeland Security (DHS) for approximately seven years. Specifically, from 2007 to 2014, Shiba was employed as an Immigration Information Officer (IIO) in the Chicago field office of DHS's United States Citizenship and Immigration Services (USCIS).

For much of his employment with USCIS, Shiba was on medical leave.

On June 6, 2007, approximately two months after starting work, Shiba was injured at work in a slip and fall in the bathroom and went on medical leave. Shiba went on leave without pay on July 22, 2007 and remained on leave. He received workers' compensation, as approved by the U.S. Department of Labor (DOL)'s Office of Workers' Compensation Programs (OWCP) based on disability from the injury. On November 18, 2009, DOL determined that Shiba's injuries rendered him "incapable of suitable employment" with "no wage-earning capacity."

Several years after Shiba began work and was injured (both in 2007), on June 9, 2010, DHS (USCIS) terminated Shiba for unavailability for duty, noting that Shiba had been on leave without pay since July 22, 2007, he had not reported to work since his injury, his medical conditions diagnosed in 2007 (post-concussion syndrome and lumbar disc syndrome) had not resolved, his return to work was not foreseeable, and his position was one that needed to be filled by an employee available for duty on a regular basis.

Shiba appealed the 2010 termination to the Merit Systems Protection Board (MSPB), and during the MSPB hearing presented for the first time restrictions submitted by his doctors under which he could work. The MSPB ordered that Shiba be reinstated.

Having been reinstated, between November 21, 2010, and January 10, 2011, Shiba returned to work. But during this brief return, Shiba was (according to Shiba) denied accommodations submitted by his doctors, including hourly stretch breaks, causing his injury to recur. On January 10, 2011, Shiba went on medical leave and never returned to work. Shiba was placed on leave without pay on January 17, 2011. He filed a claim with DOL's OWCP for recurrence of his original work-related injury. His workers' compensation pay resumed. On June 7, 2013, DOL determined that vocational rehabilitation was not possible for Shiba because he "d[id] not have any workability."

USCIS notified Shiba of his termination in an August 18, 2014 letter from USCIS District Director Thomas Cioppa. As the basis of the termination, the letter stated that Shiba was a reemployed annuitant (a retired federal annuitant who is appointed to a position at another federal agency),[3] and that under applicable law, a reemployed annuitant serves at the pleasure of the appointing agency. Later, Cioppa also stated in an affidavit that Shiba was terminated due to the fact that, over the past few years, Shiba had provided "no services to the Agency."

---

[3] When Shiba was first hired at DHS, Shiba was (as far as USCIS was aware) on a disability annuity related to prior employment with the Social Security Administration, i.e., other federal employment that predated his USCIS employment.

More specifically: The claims in this case involve DHS. However, Shiba originally began his federal employment with a different federal agency, the Social Security Administration ("SSA"). Shiba began his employment with SSA in 1998. [67] at 3–4 ¶ 8. In December of 2002, while working at the SSA, Shiba slipped and fell in the bathroom, and went on medical leave. *Id.* He resigned from his position in 2003. *Id.* Shiba began to receive disability compensation benefits from the United States Department of Labor's Office of Worker's Compensation Programs (DOL's OWCP) shortly after the fall. *Id.* at 3–4 ¶ 8. The Office of Personnel Management ("OPM") approved annuity payments for him on August 5, 2004. *Id.* at 4 ¶ 9.

Several years later, the employment at issue in this case began. Specifically, on April 1, 2007, DHS hired Shiba to be an Immigration Information Officer ("IIO") with the United States Citizenship and Immigration Services ("USCIS"). *Id.* at 1–2 ¶ 1 (citing [63] at 1–2 ¶ 1). When Shiba was hired into this position, he was receiving his disability annuity through OPM (related to the prior SSA employment). *Id.* at 4 ¶ 10. During his employment at USCIS as an IIO, Shiba's salary was offset by the amount of his disability annuity, and his pay reflected that he continued to receive his disability annuity. *Id.* at 4 ¶ 10.

Meanwhile, beginning in 2011, for approximately two years, DHS's Office of the Inspector General (OIG) conducted an investigation into alleged misuse of position by Shiba. The allegations included that Shiba had emailed a United Nations agency, the Office of the United Nations High Commissioner for Refugees (UNHCR), on behalf of refugees, and while Shiba had emailed in a personal capacity, he also had mentioned in the email that he worked for DHS.

Ultimately, in March 2014, OIG issued a Report of Investigation and concluded (among other conclusions) that the OIG investigation did produce evidence to support the allegation that Shiba misused his position when he contacted UNHCR to inquire about the status of refugee cases.

Later, in 2017, Shiba was tentatively selected for a position at DHS's Immigration and Customs Enforcement (ICE) as an Enforcement and Removal Assistant (ERA) in the ICE Chicago field office. The tentative selection, and the setting of a start date, were premised on the successful completion of pre-employment requirements, including an initial suitability determination (a preliminary employment and fitness check, not a full background investigation) made by ICE's Personnel Security Unit (PSU). Shiba's suitability determination remained pending with the PSU for eight months. Ultimately, the ICE Chicago field office director decided to rescind Shiba's selection. On May 11, 2018, Shiba was notified that his offer of employment for the ERA position was rescinded.

## II. Details

**2007 USCIS employment, injury, and leave.** On April 1, 2007, DHS hired Shiba to be an Immigration Information Officer (IIO) with United States Citizenship and Immigration Services (USCIS). [67] at 1–2 ¶ 1 (citing [63] at 1–2 ¶ 1).

As noted in footnote 3 above, when Shiba was hired into this position at USCIS, he was receiving a disability annuity through OPM related to prior federal employment with the Social Security Administration (SSA). [67] at 4 ¶ 10. During his employment at USCIS as an IIO, Shiba's salary was offset by the amount of his disability annuity (related to his prior SSA employment), and his pay reflected that he continued to receive his disability annuity. *Id.* at 4 ¶ 10.

About two months after starting employment at USCIS (in June 2007), Shiba injured himself in the bathroom. *Id.* ¶ 11. Afterwards, Shiba filed a workers' compensation claim with DOL and ultimately DOL adjudicated the claim in his favor. *Id.* at 4–5 ¶¶ 11–12 (noting dispute as to timing of DOL adjudication, which is not material). Shiba remained on complete medical leave for over two and a half years. *Id.* at 5 ¶ 12. On November 18, 2009, DOL determined that Shiba's injuries

4

rendered him "incapable of suitable employment" with "no wage-earning capacity." *Id.* at 5 ¶ 12 (quoting [63-2] at 184).

**2010 USCIS termination, MSPB appeal, and reinstatement.** USCIS notified Shiba of his removal from employment in a termination letter dated June 9, 2010. *Id.* at 5 ¶ 13. It stated that Shiba had been on disability for nearly three years and was thus "unavailable for duty." *Id.* The letter further explained that the medical evidence demonstrated that Shiba was "diagnosed with post-concussion syndrome and lumbar disc syndrome" in 2007 and that, "to date, these conditions have not resolved." *Id.* The letter noted that Shiba's physician had "indicated that [he was] unable to perform [his] duties," and that he had "not reported to work since [his] injury." *Id.*

Shiba challenged his termination with the Merit Systems Protection Board ("MSPB"). *Id.* at 5 ¶ 14. During the MSPB hearing, Shiba, for the first time (i.e., there is no evidence that Shiba had previously presented this documentation to USCIS), presented medical documentation that indicated he could return to work with medical restrictions. *Id.* The MSPB ordered USCIS to reinstate Shiba with restrictions. *Id.* at 6 ¶ 15(a).

**November 2010-January 2011 return to work and subsequent leave.** Shiba returned to work as an IIO at USCIS on November 21, 2010. *Id.* at 7 ¶ 17. Dr. Curran, one of Shiba's personal physicians, submitted a work capacity evaluation, stating that Shiba was to "limit excessive walking if possible" and advising that Shiba would "need to be able to get up from sitting" on an hourly basis. *Id.* at 7 ¶ 18. After USCIS asked Shiba to clarify the restrictions from Dr. Curran, Dr. Curran submitted another work capacity evaluation, stating that Shiba's walking and sitting were limited, that he could "walk only from cubicle to cubicle as outline [sic] in job description," and that Shiba was to be provided five-minute breaks on an hourly basis in order to "stretch at desk." *Id.* at 7 ¶¶ 18–19.

After receiving Dr. Curran's second work capacity evaluation, USCIS informed Shiba that he would be permitted to walk the first-floor customer area, to walk from his cubicle to the customer service window and back, and to take five-minute stretch breaks on an hourly basis. *Id.* at 8 ¶ 20. Shiba claims, however, that his supervisors, Martha Medina and Melinda Leach, denied him these accommodations. *Id.* at 8–9 ¶¶ 21–23. For example, Shiba testified that he had severe migraines and vomiting, but Medina told him not to take breaks and not to complain about pain. *Id.*; [63-2] at 66–67 (pp. 155–59).

Shiba frequently took medical leave after being reinstated, taking all or part of 17 days off work between November 21, 2010 and January 10, 2011. [67] at 10 ¶ 27. On December 20, 2010, Shiba's physician stated that Shiba was to "remain off work" and instructed him to return for an assessment in two weeks. *Id.* at 11¶ 29.

After January 10, 2011, Shiba never returned to work. *Id.* at 11 ¶ 31. Shiba was placed on leave without pay on January 17, 2011, and his workers' compensation pay resumed shortly thereafter. *Id.* at 12 ¶ 34.

To seek the resumption of his workers' compensation pay (which ultimately resumed, as noted above), Shiba filed a claim with DOL's OWCP for recurrence of his original work-related injury. *Id.* at 11 ¶ 32. OWCP requested additional information from Shiba in order to establish that his injury had reoccurred. *Id.* In response to OWCP's request for information, on March 1, 2011, Shiba wrote to OWCP:

> My current disability or medical treatment is related to the original work injury, because my condition has not changed, I was never better and always sick and complaining, and I was not returning to work unless I felt desperate to keep my job because I was terminated on June , [*sic*] 2010 because I was unable to return to duty. I appealed my employers (USCIS) decision to the MSPB and was forced to pressure my physicians into releasing me to work against their recommendations, otherwise I was discharged on June, 2010 and later reinstated by the MSPB by having a hearing which reversed this termination. I felt this was the only way to keep my employer from terminating me. In reality I was not ready to return to work that is why I am filing for recurrence.

*Id.* at 12 ¶ 33; [64-1] at 59.

On June 7, 2013, DOL determined that vocational rehabilitation was not possible for Shiba because he "d[id] not have any workability." [67] at 12 ¶ 35.

**OIG investigation.** Meanwhile, on July 9, 2011, a State Department employee forwarded an email to Barbara Strack, Chief of the Refugee Affairs Division at USCIS. *Id.* at 13 ¶ 36. In the forwarded message, Shiba wrote:

> I am trying to assist several families from Iraq that have been in Syria quite some time with no hope. I would appreciate your reply so I can forward you the cases . . . . I am an Immigration Officer with Homeland Security . . . This email is my personal and not work related. These messages and emails are not related in any way to my current employment.

*Id.* (ellipsis in original). The State Department employee then wrote:

> I have been approached by UNHCR [United Nations High Commissioner for Refugees] to inquire with you about an email they

6

received from a person who claims to be a DHS employee. The person is inquiring directly to UNHCR about an Iraqi refugee case and saying the inquiry is in a personal capacity, though they mention their DHS role too. This seems to be a conflict of interest for an officer to mention their position and make an inquiry of this nature. If you agree, what action can DHS take to inform the employee to modify or cease such behavior.

*Id.* at 13 ¶ 37 (alteration in original).

In short, Shiba emailed UNHCR, UNHCR forwarded Shiba's email to the State Department, and the State Department forwarded Shiba's email to USCIS. USCIS staff forwarded the email chain internally within USCIS and requested guidance on how to proceed. [64-1] at 68-75. On August 31, 2011, William Mills, Associate Counsel and Associate Ethics Officer at USCIS / DHS, Office of the Regional Director, responded to the internal USCIS staff request for guidance (which, again, included the forwarded email chain described above, that included Shiba's email to UNHCR, which the State Department ultimately forwarded to USCIS). (Mills's email signature block shows that he was employed in California.) Mills explained that Shiba's actions violated applicable ethics regulations and may have constituted a criminal offense. [67] at 14–15 ¶¶ 39–40; [64-1] at 68-75. Mills recommended that, before sending Shiba a counseling letter, USCIS staff seek an opinion from a different division, the USCIS Commercial and Administrative Law Division (CALD), which had responsibility for matters concerning employee discipline; Mills also recommended "referring the matter to OSI [Office of Security and Integrity] and/or OIG [Office of Inspector General] for possible investigation of the criminal violation of 18 U.S.C. 203 & 205." [64-1] at 68.[4]

---

[4] Shiba purports to dispute DHS's SOF ¶¶ 39–40 (which quote Mills's recommendations of seeking an opinion from CALD before sending Shiba a counseling letter and referring the matter to OSI and/or OIG) on the basis that the statements are "incomplete and therefore misleading." [67] at 15 ¶¶ 39(a), 40(a). Shiba argues that the statements are incomplete and misleading because Mills's recommendations rested in part on Mills's understanding (provided by USCIS staff who requested Mills's opinion) that "this employee has a pending appeal from a USCIS removal action"—when in fact the MSPB had ordered Shiba reinstated almost a year earlier. On review of Mills's email, [64-1] at 68, the quotations are accurate and not misleading and there is no genuine dispute of material fact as to the accuracy of the quotations. As to the accuracy of the information that USCIS staff provided to Mills (that Shiba had a pending appeal from a USCIS removal action, when in fact Shiba did not): On review of Mills's email, [64-1] at 68, Mills's opinions (that Shiba had violated the ethics regulations and potentially criminal statutes) do not rely on the point that Shiba had a pending appeal from a USCIS removal action. Mills mentioned that point for a different reason; he mentioned the point while explaining his recommendation that before sending a counseling letter, USCIS staff seek an opinion from a different division (USCIS Commercial and Administrative Law Division (CALD)), which had responsibility for matters concerning employee discipline. There is no genuine dispute of material fact.

A few weeks later, on September 27, 2011, Ruth Dorochoff, the District Director of Chicago's USCIS office, reported via email Shiba's alleged misconduct to USCIS's Office of Security and Integrity (OSI) and Office of Inspector General (OIG). [67] at 16 ¶ 42. Dorochoff's email to OIG stated that she had been informed that Shiba was contacting the UNHCR and making inquiries on behalf of Iraqi refugees and that, while Shiba's contact to UNHCR indicated that he made the inquiry in a personal capacity, Shiba also referenced his position with DHS. *Id.* at 16 ¶ 42.

Shiba points out that Dorochoff's email to OIG stated that it "appear[ed]" that Shiba or a third party designated by him "may be receiving compensation for the representative services he is providing to these refugees." *Id.* at 16 ¶ 42(a); [64-1] at 108. Shiba also notes that Dorochoff's email to OIG stated that Shiba was "currently on complete and total disability and receiving OWCP benefits," and "has consistently asserted that he is unable to return to work and perform the duties of his position as an Immigration Services Officer, at the same time he is acting as a representative before the UNHCR." [67] at 16 ¶ 42(a); [64-1] at 108.

The OIG commenced an investigation into Shiba's alleged misconduct. [67] at 17 ¶ 44. OIG conducted the investigation for approximately two years; the investigation included, among other things, interviewing Shiba and various witnesses (including family members), as well as reviewing emails and bank records. *Id.* Shiba testified at deposition that he was videotaped on one occasion; that unidentified OIG agents told him USCIS was looking for a reason to terminate him, and that he should resign from his position;[5] and that he had prior experience with the OIG agent supervising the matter. *Id.* at 17 ¶ 44(a).

On March 5, 2014, the OIG issued a Report of Investigation (ROI) determining that:

- "[t]he OIG investigation did produce evidence to support the allegation that Shiba misused his position when he contacted UNHCR to inquire on the status of Iraqi refugee cases. On some of Shiba's emails to

---

[5] Defendant notes correctly that the alleged comments by unidentified USCIS OIG agents are inadmissible hearsay. Even if the underlying statements by USCIS decisionmaker(s) (e.g., Dorochoff and / or Medina) are admissions of a party opponent under Rule 801(d)(2)(D), defendant argues correctly that Shiba has not demonstrated that the OIG agents had any responsibility relating to the decisionmaking process affecting Shiba's employment. *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011). Thus, the OIG agents' statements regarding what USCIS decisionmaker(s) said are inadmissible hearsay. The court does not consider these statements at summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

UNHCR, Shiba stated he was inquiring on a personal capacity but also mentioned his position with USCIS DHS";

- "[i]n addition, during the course of the investigation Shiba presented his USCIS credentials as a form of identification to the OIG, in an attempt to gain leverage during a witness interview";

- "[f]urther investigation revealed that Shiba made a false statement on his employment application when he stated that he had never been, 'fired from any job for any reason, did you quit after being told that you would be fired.' The investigation produced evidence that Shiba resigned in lieu of being terminated by the Social Security Administration (SSA)"; and

- "[i]n addition, while being interviewed by the OIG, Shiba knowingly and intentionally made a false statement, when he stated he did not provide immigration or UNHCR assistance to anyone other than family members. The investigation produced evidence that Shiba assisted individuals other than family members."

[64-1] at 112–13; [67] at 18 ¶ 45. As Shiba notes, the OIG did not make any finding that Shiba received any compensation for the alleged conduct. [67] at 18 ¶ 45(b). The matter was referred to the U.S. Attorney's Office for the Northern District of Illinois, but the office declined to prosecute. *Id.* at 18 ¶ 46.

**2014 USCIS termination.** On August 18, 2014, Thomas Cioppa, the District Director for the Chicago District Office of USCIS, sent Shiba a letter notifying Shiba that he would be terminated from employment (as an IIO) on August 25, 2014. *Id.* at 19 ¶ 47; [65-1] at 2.[6] The termination letter stated that a retired federal employee receiving an annuity who is appointed to a position at another federal agency is a reemployed annuitant and serves at the pleasure of the appointing agency. [67] at 19 ¶ 48; [65-1] at 2. In a later affidavit (provided as part of a USCIS EEO investigation, dated December 16, 2015, and discussed further below), Cioppa stated that Shiba "was on leave related to his receipt of workers compensation benefits for many years. During the course of those years, he provided no services to the Agency." [67] at 19 ¶ 48; [65-1] at 6, 11.

---

[6] Ruth Dorochoff was the District Director for the USCIS Chicago District Office when Shiba was ordered reinstated by the MSPB in 2010, when Shiba went on leave without pay in January 2011, when Dorochoff referred Shiba to the OIG for investigation in September 2011, and when the OIG investigation concluded in March 2014. [67] at 3 ¶ 6(a). Cioppa held the same position (District Director for the USCIS Chicago District Office) starting on August 10, 2014, *id.* at 3 ¶ 6—approximately two weeks before the August 18, 2014 termination letter.

Cioppa was not deposed, but he provided two affidavits as part of a USCIS EEO investigation, one on May 22, 2015, [63-2] at 128–37, and another on December 16, 2015, [65-1] at 5–11. In the affidavits, Cioppa stated that at the time of his decision to terminate Shiba, he had no knowledge of Shiba's disability, Shiba's prior protected activity (prior EEO activity), or the circumstances surrounding the OIG investigation. [63-2] at 129–30, 132 (questions 3, 9, 11, 12, 29–31). Cioppa did also state that he became aware in August 2014 that Shiba had filed a previous MSPB complaint for a previous termination that resulted in Shiba's reinstatement in 2010, but stated that he (Cioppa) had no knowledge regarding the specific allegations made by Shiba in his appeal to the MSPB. [65-1] at 6 (questions 6–8). Cioppa stated (again, in an affidavit; Cioppa was not deposed) that he "consulted" with Martha Medina regarding Shiba's termination (and, in the affidavit, listed her phone number). [63-2] at 131 (question 27). The affidavit also lists several people from "LER" (Labor and Employee Relations), two of whom Cioppa worked with and one of whom Cioppa "may have spoken to," during the process of terminating Shiba, as well as their phone numbers. [63-2] at 131 (question 28). (The affidavit does not explain what form any consultations took or what they involved; at most, by providing phone numbers, it may imply that Cioppa spoke on the phone with people he consulted, but that is not clear.) Martha Medina was deposed; she testified that she did not remember whether she had any conversations with Cioppa about Shiba and did not recall having any conversations, and that she was not involved in the recommendation to terminate Shiba. [66-1] at 74 (43:8–15), 76-77 (45:12–46:8).

Shiba made initial contact with the USCIS Office of Equal Opportunity and Inclusion (OEOI) regarding his USCIS termination on October 8, 2014, and filed a formal complaint with OEOI on January 14, 2015. [67] at 28 ¶ 67. The complaint stated that Shiba believed he was discriminated against on account of his disability, suffered a hostile work environment, and was retaliated against because of prior protected activity. *Id.*

**ICE tentative selection and rescindment.** ICE (a different DHS sub-agency from USCIS) tentatively selected Shiba for an Enforcement and Removal Assistant (ERA) position on June 15, 2017. *Id.* at 19–20 ¶ 50. The position was in the ICE Chicago field office. The selection was predicated on, among other things, Shiba's completion of pre-employment requirements, such as a background investigation. *Id.*

Generally speaking, once a field office tentatively selects a candidate for a position, ICE's Office of Human Capital then coordinates the pre-employment review, including by notifying ICE's Personnel Security Unit (PSU) that a suitability determination (required by regulation) must be made. [67] at 20 ¶ 51. The PSU conducts an "EOD" (enter-on-duty) check, meaning a preliminary employment and fitness check that takes place before a full background investigation. *Id.* If there are no concerns found during the EOD check, PSU will

authorize the individual to begin working for ICE before PSU has determined their suitability for permanent employment. *Id.*

On July 31, 2017, Shiba's suitability determination was assigned to a Personnel Security Specialist in the PSU EOD Section. *Id.* ¶ 52. The PSU Specialist requested further information from Shiba on August 3, 2017, and Shiba responded. [67] at 20-21 ¶ 53. On October 10, 2017, PSU sent a notice of proposed action (NOPA) to Shiba, informing Shiba that PSU had found adverse information that could warrant a finding that Shiba was unsuitable for employment, and listing a series of charges and specifications based on OIG records. *Id.* at 21 ¶ 54, 54(a); [65-1] at 66-70. PSU provided Shiba an opportunity to offer further information that could mitigate the agency's suitability concerns. *Id.* Shiba provided two responses to the NOPA. *Id.* at 21-22 ¶ 55. On February 23, 2018, less than three hours after Shiba sent his supplemental response to the NOPA, the PSU Specialist recommended to his supervisor that Shiba be deemed unsuitable for employment. [67] at 22-23 ¶¶ 56, 56(a). However, only PSU's Division Chief is authorized to determine that an applicant is unsuitable for employment. *Id.* at ¶ 57. PSU's Division Chief never made a final determination that Shiba was unsuitable for employment. *Id.* Thus (i.e., because there never was a final unsuitability determination by PSU), Shiba was never informed that he had been deemed unsuitable for employment. *Id.*

Shiba's suitability investigation began in July 2017 and was still pending at the end of April 2018. [67] at 23 ¶ 58. Between at least September 2017 and April 2018, employees within ICE's Office of Human Capital repeatedly inquired with PSU regarding the status of Shiba's pending suitability determination. *Id.* at 23-24 ¶ 59 (citing email inquiries on September 20, 2017, November 8, 2017, January 5, 2018, February 26, 2018, March 21, 2018, and April 23, 2018). PSU consistently responded that Shiba's suitability determination was pending and that the Office of Human Capital would be notified when the process was complete. *Id.*

During this time, the Chicago field office would also receive spreadsheets ("TOPS reports") prepared by ICE headquarters reflecting the status of all positions that were vacant or in the process of being filled. *Id.* at 24 ¶ 60. These spreadsheets stated that Shiba's suitability determination was "pending PSU" and that Shiba had been sent a "Notice of Proposed Action" due to "significant derogatory issues." *Id.* Shiba does not dispute these facts, nor does he contend that the spreadsheets said what the derogatory information was; but he adds that a February 26, 2018 status report states that "Applicant requested materials relied upon. Materials currently being vetted. Applicant will have 15 days to reply once materials are sent," when in fact three days before the February 26, 2018 status report, Shiba had sent a supplement and the PSU Specialist had made his unsuitability determination. *Id.* at 24 ¶ 60(a). (Again, the PSU Specialist made a recommendation, not the final PSU determination; no final PSU determination was

ever made. Regardless, any inaccuracy in the February 26, 2018 status report does not raise a genuine issue of material fact.)

Ricardo Wong was the Field Office Director at ICE's Chicago field office in July 2018. [67] at 3 ¶ 7. Angelina Ramos was the Supervisory Mission Support Specialist; her role was, among other things, to supervise mission support personnel, submit documentation for hiring and announcing vacancy positions, set up interviews, and prepare official employment-related documentation. [67] at 25 ¶ 61. Wong and Ramos would routinely discuss personnel decisions and actions. *Id.*

Ramos testified at deposition that when the spreadsheets from headquarters said that there was derogatory information, and "we" (Wong and Ramos, working on behalf of the Chicago field office) needed the position filled, and the PSU determination had been pending for about 12 months (a year—which Ramos testified was taking too long), they inquired with "Laguna" (which Ramos testified meant the Office of Human Capital, which then, she believed, consulted somewhere else, Ramos did not know who) whether they could rescind the offer, and were told they could. [65-1] at 17 (11:12-12:15), 19-20 (20:14-23:14).[7]

Ultimately, Wong made the decision to rescind Shiba's selection. [67] at 26 ¶ 63. Wong's decision to rescind Shiba's offer was based solely on the fact that Shiba's suitability determination had been pending for a year, "significant derogatory information" had been discovered during the suitability determination, and the ICE field office needed to "fill that mission critical position quickly." *Id.* (quoting Wong deposition). On May 11, 2018, Shiba was notified that his offer of employment for the ERA position was rescinded. [67] at 26 ¶ 64.

Wong testified (partly by deposition, partly by affidavit) that when he decided to rescind Shiba's selection, he did not know that Shiba had ever been employed at

---

[7] Shiba disputes that Wong and Ramos discussed rescinding the offer after the suitability determination had been pending for months, [67] at 25-26 ¶ 62(a), but defendant correctly notes that Shiba does not cite any evidence that supports a different timeline, [73] at 33-34. Shiba also states that Wong and Ramos inquired with PSU to find out how long it would take for Shiba to clear and whether they could rescind the offer due to how long Shiba was in PSU, [67] at 25 ¶ 62(a), but Shiba does not cite any evidence that supports an inference that Wong and Ramos inquired with PSU, [73] at 33-34. Rather, defendant cites the deposition testimony of the Unit Chief for the Adjudications Unit, PSU, that he never spoke with anyone regarding Shiba's offer and he had no knowledge of anyone from PSU speaking to anyone in ICE's Chicago office regarding Shiba's offer, [73] at 34 ¶ 62; Ramos testified that she and Wong were getting biweekly TOPS reports from headquarters saying that Shiba was still pending PSU, "[w]e don't go to PSU and ask them what the issue is," and there is nothing they (Wong and Ramos) can do if something at PSU is taking a long time, [65-1] at 20 (23:8-11); and both Wong and Ramos testified that Wong made the decision to rescind Shiba's selection, [67] at 26 ¶ 63. Thus, there is no genuine dispute of material fact.

USCIS; that Wong never spoke to anyone at USCIS or OIG regarding Shiba nor did Wong ever review OIG's Report of Investigation before he made the decision to rescind Shiba's offer; that Wong never saw or reviewed the contents of the NOPA or Shiba's responses to the NOPA; that although Wong was told that "significant derogatory information" was discovered regarding Shiba, Wong "did not ask and did not need to know" what the information was specifically regarding; and that Wong did not know of Shiba's MSPB action, prior protected EEO activity, or pending lawsuit at the time he made the decision to rescind Shiba's tentative selection. [67] at 26-27 ¶ 65.

Before deciding to rescind Shiba's tentative selection, Wong consulted with Ramos. Like Wong, Ramos had no access to and did not review the information associated with Shiba's suitability determination. Ramos testified that she did not know that PSU issued a NOPA to Shiba or that Shiba had responded; she never saw or discussed the contents of the NOPA with anyone; no one in the Chicago field office would have had access to the NOPA or Shiba's responses; she never spoke with PSU employees regarding Shiba; she did not know what the "derogatory information" was that was referenced in the TOPS reports and never inquired with PSU regarding what issues had been raised during the suitability investigation; she never spoke with anyone at USCIS or OIG regarding Shiba; and she has never met or spoken to Shiba, does not know if he is disabled, does not know why he left USCIS, and does not know if he was ever investigated by OIG or the outcome of the investigation. [67] at 27-28 ¶ 66.

Shiba made initial contact with the ICE EEO office on May 24, 2018, regarding his application for employment with ICE; he filed a formal complaint on October 8, 2018. *Id.* at 28–29 ¶ 68.

Shiba's amended complaint alleges four claims under the Rehabilitation Act and Americans with Disabilities Act: disability discrimination and failure to accommodate (Count 1); hostile work environment (Count 2); retaliatory discharge (Count 3); and retaliatory failure to hire (Count 4). [37]. The first three claims relate to USCIS; the fourth claim relates to ICE. The Secretary now moves for summary judgment. [61].

## LEGAL STANDARDS

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.*

The party seeking summary judgment bears the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks and footnotes omitted). Construing the evidence and facts supported by the record in favor of the nonmoving party, the court gives the nonmoving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## DISCUSSION

Three of Shiba's claims—Counts 1 (disability discrimination and failure to accommodate), 2 (hostile work environment), and 3 (retaliatory discharge)—relate to USCIS. The fourth claim—Count 4 (retaliatory failure to hire)—relates to ICE. Summary judgment is warranted on all claims for the reasons given below.

## I. Claims as to USCIS (Counts 1 (disability discrimination and failure to accommodate), 2 (hostile work environment), and 3 (retaliatory discharge))

### A. Exhaustion

The Secretary first argues that, to the extent that the claims as to USCIS (Counts 1 (disability discrimination and failure to accommodate), 2 (hostile work environment), and 3 (retaliatory discharge)) rest on conduct that occurred during Shiba's November 2010-January 2011 return to work, the claims are unexhausted because Shiba did not contact an EEO counselor within the 45-day window required by regulation. [62] at 11–13.

29 C.F.R. § 1614.105(a) states:

Aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter.

(1) An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.

14

> (2) The agency or the Commission shall extend the 45-day time
> limit in paragraph (a)(1) of this section when the individual shows
> that he or she was not notified of the time limits and was not
> otherwise aware of them, that he or she did not know and
> reasonably should not have been known [*sic*] that the
> discriminatory matter or personnel action occurred, that despite
> due diligence he or she was prevented by circumstances beyond
> his or her control from contacting the counselor within the time
> limits, or for other reasons considered sufficient by the agency or
> the Commission.

This regulation covers claims brought under the Rehabilitation Act. *See Edwards v. Donahoe*, 503 F. App'x 468, 471 (7th Cir. 2013).[8] Under § 1614.105(a)(1), a plaintiff "must exhaust [his] administrative remedies by consulting an EEO counselor and attempting to resolve the matter informally before [he] may file [his] claim in the district court." *Edwards*, 503 F. App'x at 471. Further, § 1614.105(a)(1) sets a 45-day time limit for initiating contact with a counselor. But § 1614.105(a)(2) provides for the possibility of an extension of the 45-day time limit, as quoted above.

To review the timeline: Shiba obtained the MSPB order permitting him to return to work with restrictions on October 15, 2010. He then returned to work in November 2010-January 2011, but contends that during this time, his supervisors instructed him not to complain about pain, not to take breaks, and not to follow his physicians' prescribed restrictions. (It is claims stemming from this latter period, the November 2010-January 2011 return to work, that the Secretary contends are unexhausted.) The last date Shiba reported to work was January 10, 2011. On January 10, 2011, Shiba went on medical leave and never returned to work. Shiba was placed on leave without pay on January 17, 2011. He filed a claim with DOL's OWCP for recurrence of his original work-related injury. His workers' compensation pay resumed. Shiba was referred for OIG investigation on September 27, 2011. The OIG issued its report of investigation on March 5, 2014. Shiba was terminated on August 18, 2014. Shiba first contacted the USCIS OEOI on October 8, 2014.

The Secretary argues that claims regarding Shiba's November 2010-January 2011 return to work (when the supervisors allegedly denied accommodations

---

[8] Because the ADA does not apply to federal agencies, *see* 42 U.S.C. § 12111(5)(B)(i), the court treats all of Shiba's claims as arising under the Rehabilitation Act. *See Hancock v. Potter*, 531 F.3d 474, 478 n.4 (7th Cir. 2008); *Dyrek v. Garvey*, 334 F.3d 590, 597 n.3 (7th Cir. 2003). "[I]n determining whether a violation of the Rehabilitation Act occurred in the employment context," courts use "the standards set out in the ADA." *Dyrek*, 334 F.3d at 597 n.3; *see also, e.g.*, *Sansone v. Brennan*, 917 F.3d 975, 979 n.1 (7th Cir. 2019); *Scheerer v. Potter*, 443 F.3d 916, 918–19 (7th Cir. 2006).

prescribed by Shiba's physicians) are unexhausted. The Secretary argues that Shiba was placed on leave without pay on January 17, 2011, that Shiba never returned to work after January 2011 through his 2014 termination, and that Shiba first contacted the OEOI on October 8, 2014, well after 45 days had elapsed from the November 2010-January 2011 return to work.

In response, Shiba argues that conduct related to Counts 1, 2, and 3 continued while he was on leave without pay and therefore he timely filed a complaint with the OEOI. [66] at 4. Relying on the continuing violation doctrine, Shiba contends that his departure in January 2011 did not end the cumulative effect of the conduct, especially for the hostile work environment claim, and considering not only the supervisors' conduct that occurred during his November 2010-January 2011 return to work but also the referral to the OIG (which occurred on September 27, 2011) and ongoing OIG investigation (which continued at least through the OIG report on March 5, 2014).

The Secretary contends that Shiba's claims concern three discrete actions, each of which required exhaustion, rather than a pattern of conduct: (1) Shiba's return to work (November 2010-January 2011), (2) the OIG investigation (October 2011-summer 2014), and (3) Shiba's 2014 termination. The Secretary argues that the commencement of the OIG investigation and the investigation itself do not constitute a pattern that would save Shiba's claims arising from his 2010-2011 return to work.

The Secretary's argument is persuasive. If "the acts about which an employee complains are part of the same actionable hostile work environment practice," then the court "must determine whether any act falls within the statutory period." *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 724 (7th Cir. 2004) (citations and internal quotation marks omitted). "Without a hostile act within the limitations period, we cannot consider component hostile acts that occurred outside the limitations period." *Id.* "Acts . . . so discrete in time or circumstances that they do not reinforce each other cannot reasonably be linked together into a single chain, a single course of conduct, to defeat the statute of limitations." *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 727 (7th Cir. 2004) (citation and internal quotation marks omitted). Here, Shiba's return to work occurred in November 2010-January 2011. He was placed on leave without pay on January 17, 2011. The OIG referral (which led to the investigation) began in September 2011. These two events were months apart, and more importantly, they arose from discrete circumstances. The leave without pay (Shiba's not returning to work after January 2011), on Shiba's argument, occurred after his supervisors did not allow him the accommodations prescribed by his physicians. The referral to the OIG, on the other hand, occurred after USCIS was notified by the State Department that Shiba was allegedly contacting UNHCR and potentially misusing his USCIS position. These events are sufficiently discrete in both time and circumstances that no reasonable juror could

16

conclude that they were part of a continuing pattern. Thus, the OIG referral and investigation do not save the timeliness of claims based on the 2010-2011 return to work.

The exception in § 1614.105(a)(2) does not apply. Shiba does not address § 1614.105(a)(2) in his briefing and thus has forfeited any argument that it applies. Nor has he pointed to evidence that: (1) he was not notified of the time limits and was not otherwise aware of them; (2) he did not know or reasonably should not have known that the allegedly discriminatory matter or personnel action occurred; or (3) despite due diligence, he was prevented by circumstances beyond his control from contacting the counselor within the time limits. To the contrary, he does not dispute that after his interaction with Medina (one of the supervisors who allegedly denied him accommodations during his November 2010-January 2011 return to work), he spoke with someone in USCIS's HR department and was referred to his union, a union representative told him he could file a EEOC complaint, and he spoke with his attorneys regarding what happened. [67] at 9-10 ¶ 26.

Thus, Shiba's claims as to USCIS (Counts 1 (disability discrimination and failure to accommodate), 2 (hostile work environment), and 3 (retaliatory discharge)) are unexhausted insofar as they rest on conduct that occurred during his 2010-2011 return to work.

Summary judgment is warranted on each of Counts 1, 2, and 3 for the additional reasons discussed below.

## B. Count 1 – Disability Discrimination and Failure to Accommodate

To the extent this claim rests on USCIS employees' conduct during Shiba's November 2010-January 2011 return to work, the claim is unexhausted for the reasons given above. Even if the claim were fully exhausted, defendant is entitled to summary judgment on the claim. First, no reasonable juror could conclude that Shiba is a "qualified individual" under the ADA / Rehabilitation Act. Second, no reasonable juror could conclude that the OIG referral and investigation or Shiba's termination were caused by his disability.

### 1. "Qualified individual" under the ADA / Rehabilitation Act

"A claim for failure to accommodate under the ADA (and the Rehabilitation Act, generally) requires proof (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of his disability; and (3) defendant failed to accommodate his disability reasonably." *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (citations and emphasis omitted). Again, "in determining whether a violation of the Rehabilitation Act occurred in the employment context," courts use

17

"the standards set out in the ADA." *Dyrek v. Garvey*, 334 F.3d 590, 597 n.3 (7th Cir. 2003).

The ADA defines "qualified individual" as follows (as relevant): "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. . . ." 42 U.S.C. § 12111(8); *see also Leibas v. Dart*, No. 23-1275, 2024 WL 3565265, at *2 (7th Cir. July 29, 2024).

As the Seventh Circuit has explained:

To succeed on an ADA claim, a plaintiff must show that, "with or without reasonable accommodation," he can "perform the essential functions" of his job. 42 U.S.C. § 12111(8). . . .

Judicial estoppel provides that a party who prevails on one ground in a prior proceeding cannot turn around and deny that ground in a subsequent one. . . . It is an equitable concept designed to protect the integrity of the judicial process and to prevent litigants from playing fast and loose with the courts. . . . Its purpose is to prevent a litigant from prevailing twice on opposite theories. . . .

Claiming disability benefits and asserting ADA claims are not always mutually exclusive, but a plaintiff's sworn assertion in an application for disability benefits that she is, for example, "unable to work" will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation. . . . To be sufficient, an explanation must warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with, or without "reasonable accommodation."

*Butler v. Vill. of Round Lake Police Dep't*, 585 F.3d 1020, 1022–23 (7th Cir. 2009) (citations and internal quotation marks omitted); *see also Opsteen v. Keller Structures, Inc.*, 408 F.3d 390, 392 (7th Cir. 2005) ("*Cleveland v. Policy Management Systems, Corp.*, 526 U.S. 795 (1999), holds that receipt of Social Security disability benefits does not automatically disqualify a person from making a claim under the Americans with Disabilities Act. The Social Security system classifies many situations on a categorical basis, using presumptions ('listings') and rules (such as 'the grids') that may result in awards of benefits to persons who are able to work (at least with a reasonable accommodation). A rough cut under the Social Security system thus may be compatible with a conclusion that a given person still can do a particular job. But the Court added that contradictions are unacceptable: a person who applied for disability benefits must live with the factual representations made to obtain them, and if these show inability to do the job then an ADA claim may be

18

rejected without further inquiry."); *Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 892 (7th Cir. 2005), *as amended* (Nov. 21, 2005); *Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 791–92 (7th Cir. 1999).

Shiba received workers' compensation payments from DOL's OWCP under the Federal Employees' Compensation Act (FECA). This case arises under the Rehabilitation Act. Claims under FECA and the Rehabilitation Act are not necessarily inconsistent with each other. In many situations the two claims may be entirely consistent. Nonetheless, factual statements made to one decisionmaker in one context may estop plaintiff from making conflicting factual statements in another context, absent a "sufficient explanation." *Johnson*, 426 F.3d at 892; *Lee v. City of Salem, Ind.*, 259 F.3d 667, 674 n.3 (7th Cir. 2001) (noting that *Cleveland* "involved prior statements regarding the plaintiff's ability to work—statements which . . . often imply a context-related legal conclusion," but did not address "purely factual statements that a plaintiff may previously have made concerning the effects of his disability"; further noting that "[c]onflicts involving these types of straightforward, factual representations are governed by an established body of precedent that *Cleveland* left undisturbed") (citations and internal quotation marks omitted).

"To defeat summary judgment, [an] explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Johnson*, 426 F.3d at 892 (quoting *Cleveland*, 526 U.S. at 807).

Shiba is judicially estopped from pursuing the current claims based on his March 1, 2011 statement to DOL's OWCP.

To recap the relevant facts:

After January 10, 2011, Shiba never returned to work. [67] at 11 ¶ 31. Shiba was placed on leave without pay on January 17, 2011, and his workers' compensation pay resumed shortly thereafter. *Id.* at 12 ¶ 34.

To seek the resumption of his workers' compensation pay (which ultimately resumed, as noted above), Shiba filed a claim with DOL's OWCP for recurrence of his original work-related injury. *Id.* at 11 ¶ 32. OWCP requested additional information from Shiba in order to establish that his injury had reoccurred. *Id.* In response to OWCP's request for information, on March 1, 2011, Shiba wrote to OWCP:

> My current disability or medical treatment is related to the original work injury, because my condition has not changed, I was never better and always sick and complaining, and I was not returning to work

unless I felt desperate to keep my job because I was terminated on June , [*sic*] 2010 because I was unable to return to duty. I appealed my employers (USCIS) decision to the MSPB and was forced to pressure my physicians into releasing me to work against their recommendations, otherwise I was discharged on June, 2010 and later reinstated by the MSPB by having a hearing which reversed this termination. I felt this was the only way to keep my employer from terminating me. In reality I was not ready to return to work that is why I am filing for recurrence.

[67] at 12 ¶ 33; [64-1] at 59.

Thus, at the time of the MSPB appeal (in 2010, between the June 2010 discharge and November 2010 reinstatement), Shiba's doctors said that he could return with restrictions. But in the March 1, 2011 statement to OWCP, Shiba told OWCP that he was never ready to return to work and that he had pressured his doctors to say that he could return (for purposes of the MSPB appeal). The substance of Shiba's statement to OWCP is that his doctors were reluctant to say that he could return at all (with or without restrictions), but he pressured them to say that he could return with restrictions, and they acceded. Shiba now contends (and testified in his deposition in this case) that he was ready to return to work with the restrictions his doctors gave, but USCIS did not provide those restrictions. [67] at 12 ¶ 33(a). Those two positions go beyond legal conclusions to factual representations, and they are factually irreconcilable. Shiba has not given any explanation for the inconsistency, such as that his condition changed over time. In fact, the statement to OWCP says the opposite—that the condition never changed. Again, "[t]o defeat summary judgment, [an] explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Johnson*, 426 F.3d at 892 (quoting *Cleveland*, 526 U.S. at 807). No reasonable juror, assuming the truth of the statement to OWCP (or Shiba's good-faith belief in that statement), could conclude that Shiba could perform the essential functions of the IIO job, with or without reasonable accommodation.

### 2. Causation

Separately, defendant is entitled to summary judgment because Shiba has not pointed to evidence from which a reasonable juror could conclude that either the OIG referral and investigation or Shiba's termination were caused by his disability.

The elements of a Rehabilitation Act claim, including causation, are as follows:

Except for its "solely by reason of" standard, the Rehabilitation Act "incorporates the standards applicable to Title I of the [Americans with

Disabilities Act].” *Brumfield v. City of Chicago*, 735 F.3d 619, 630 (7th Cir. 2013). To prevail on her Rehabilitation Act claim, Whitaker must show that: “(1) she is disabled within the meaning of the statute; (2) that she was otherwise qualified for the job in question; (3) that she was discharged or the subject of other adverse action solely because of her disability; and (4) the employment program of which her job was a part received federal financial assistance.” *Felix v. Wisconsin Dep't of Transportation*, 828 F.3d 560, 568 (7th Cir. 2016).

> To avoid a motion for summary judgment challenging each element, [plaintiff] must present evidence that, if believed by a trier of fact, would establish each of these elements.

*Whitaker v. Wisconsin Dep't of Health Servs.*, 849 F.3d 681, 684 (7th Cir. 2017).

Although plaintiff cites *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), see [66] at 4, the parties analyze their arguments in terms of the “direct” and “indirect” methods of proof. As the parties frame the arguments, the “indirect” method involves the *McDonnell Douglas* framework and the “direct” method does not.

*Ortiz* “h[e]ld that district courts must stop separating “direct” from “indirect” evidence and proceeding as if they were subject to different legal standards.” 834 F.3d at 765.

> [The] legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the “direct” evidence does so, or the “indirect” evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled “direct” or “indirect.”

*Id.* But *Ortiz* clarified that its holding did not involve the *McDonnell Douglas* framework:

> One point of clarification may be helpful. The burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), sometimes is referred to as an “indirect” means of proving employment discrimination. Today's decision does not concern *McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand. We are instead concerned about the proposition that evidence must be sorted

into different piles, labeled "direct" and "indirect," that are evaluated differently. Instead, all evidence belongs in a single pile and must be evaluated as a whole. That conclusion is consistent with *McDonnell Douglas* and its successors.

*Ortiz*, 834 F.3d at 766; *see also Reives v. Illinois State Police*, 29 F.4th 887, 891–92 (7th Cir. 2022); *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367–68 (7th Cir. 2019); *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (both assessing the evidence under the *McDonnell Douglas* framework and "assessing cumulatively all the evidence").

The parties' arguments use "direct" and "indirect" as shorthand for assessing the evidence as a whole, consistent with *Ortiz*, and assessing the evidence under the *McDonnell Douglas* framework. The court will consider both analyses.

Under *Ortiz*, the question is whether the evidence as a whole would permit a reasonable juror to conclude that Shiba's disability caused the OIG referral and investigation or Shiba's termination. *See Ortiz*, 834 F.3d at 765.

Under the *McDonnell Douglas* framework:

"[T]he plaintiff must show evidence that '(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably.'" . . . "If the plaintiff meets each element of her prima facie case, 'the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'"

*McDaniel*, 940 F.3d at 368 (citations omitted). "It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010) (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005)).

Here, under either method of analyzing the record, no reasonable juror could conclude that either the OIG referral and investigation or Shiba's termination were caused by Shiba's disability.

### a.    OIG Referral and Investigation

The undisputed facts show that on September 27, 2011, Ruth Dorochoff referred Shiba to the OIG for investigation. Dorochoff was the District Director for

the USCIS Chicago District Office when Shiba was ordered reinstated by the MSPB in 2010, when Shiba went on leave without pay in January 2011, when Dorochoff referred Shiba to the OIG for investigation (on September 27, 2011), and when the OIG investigation concluded in March 2014.

It is beyond dispute (as described above in the background section) that Shiba emailed UNHCR, UNHCR forwarded Shiba's email to the State Department, and the State Department forwarded Shiba's email to USCIS. USCIS staff forwarded the email chain internally within USCIS and requested guidance on how to proceed. On August 31, 2011, William Mills, Associate Counsel and Associate Ethics Officer at USCIS / DHS, Office of the Regional Director, responded to the internal USCIS staff request for guidance (which, again, included the forwarded email chain described above, that included Shiba's email to UNHCR, which the State Department ultimately forwarded to USCIS). Mills was employed in California, not in Chicago, where Shiba and Dorochoff were employed. Mills explained that Shiba's actions violated applicable ethics regulations and may have constituted a criminal offense. [67] at 14–15 ¶¶ 39–40; [64-1] at 68-75. Mills recommended that, before sending Shiba a counseling letter, USCIS staff seek an opinion from a different division, the USCIS Commercial and Administrative Law Division (CALD), which had responsibility for matters concerning employee discipline; Mills also recommended "referring the matter to OSI [Office of Security and Integrity] and/or OIG [Office of Inspector General] for possible investigation of the criminal violation of 18 U.S.C. 203 & 205." [64-1] at 68.[9]

Thus, it is indisputable that, in response to USCIS staff's request for advice on how to address Shiba's email to UNHCR, Mills (a USCIS attorney) recommended referring the matter to OIG (among other things). In light of these facts, no reasonable juror could conclude that Dorochoff's referral to OIG (or the OIG investigation, to which the referral led) was caused by Shiba's disability. The only reasonable conclusion is that there was a legitimate, nonpretextual reason for the OIG referral and in turn the OIG investigation—namely, the advice of USCIS counsel (requested by USCIS staff).

Shiba argues that various aspects of Dorochoff's referral to the OIG (which initiated the investigation) and the investigation itself indicate that the investigation was harassment and / or pretextual. The record would not permit a reasonable juror to make that inference. For example, Shiba contends that OIG's investigation did not substantiate every aspect of Dorochoff's referral. Dorochoff's referral email to OIG stated that it "appear[ed]" that Shiba or a third party

---

[9] Shiba purports to dispute DHS's SOF ¶¶ 39–40 (which quote Mills's recommendations of seeking an opinion from CALD before sending Shiba a counseling letter and referring the matter to OSI and/or OIG) on the basis that the statements are "incomplete and therefore misleading." [67] at 15 ¶¶ 39(a), 40(a). As discussed in footnote 4 in the background section above, this purported dispute does not raise a genuine dispute of material fact.

designated by him "may be receiving compensation for the representative services he is providing to these refugees," [67] at 16 ¶ 42(a); [64-1] at 108; whereas after the investigation, while OIG found that its investigation *did* produce evidence to support the allegation that Shiba misused his position when he contacted UNHCR to inquire on the status of Iraqi refugee cases, OIG did not make any finding that Shiba received any compensation for the alleged conduct. The fact that OIG substantiated some aspects of the referral but not others is ordinary and would not support a reasonable inference that the OIG referral or investigation was caused by discrimination or was pretextual. Likewise, the facts that OIG conducted the investigation for approximately two years, and that the investigation included, among other things, interviewing Shiba and various witnesses (including family members), as well as reviewing emails and bank records, do not support a reasonable inference that the OIG referral or investigation was caused by discrimination or was pretextual.

Under the *McDonnell Douglas* method, summary judgment is warranted for the additional reason that Shiba has not pointed to any similarly situated employees who were treated more favorably.

Whether the evidence is considered under the *Ortiz* or *McDonnell Douglas* method, defendant is entitled to summary judgment.

### b. Termination

Nor could a reasonable juror conclude that Shiba's termination was caused by his disability.

To recap the relevant evidence: USCIS notified Shiba of his termination in an August 18, 2014 letter from USCIS District Director Thomas Cioppa. At the time of the letter, Cioppa had been in the District Director position for approximately two weeks; Ruth Dorochoff was the District Director at earlier times relevant to this case (when Shiba was ordered reinstated by the MSPB in 2010, when Shiba went on leave without pay in January 2011, when Dorochoff referred Shiba to the OIG for investigation in September 2011, and when the OIG investigation concluded in March 2014). As the basis of the termination, the August 18, 2014 letter stated that Shiba was a reemployed annuitant (a retired federal annuitant who is appointed to a position at another federal agency), and that under applicable law, a reemployed annuitant serves at the pleasure of the appointing agency. (As discussed above, during Shiba's employment at USCIS as an IIO, Shiba was receiving a disability annuity related to Shiba's prior employment with SSA.) Later, in a December 16, 2015 affidavit given during a USCIS EEO investigation, Cioppa stated that Shiba "was on leave related to his receipt of workers compensation benefits for many years. During the course of those years, he provided no services to the Agency." [67] at 19 ¶ 48; [65-1] at 6, 11.

Cioppa was not deposed, but he provided two affidavits as part of a USCIS EEO investigation, one on May 22, 2015, [63-2] at 128–37, and another on December 16, 2015 (as noted above), [65-1] at 5–11. In the affidavits, Cioppa stated that at the time of his decision to terminate Shiba, he had no knowledge of Shiba's disability, Shiba's prior protected activity (prior EEO activity), or the circumstances surrounding the OIG investigation. [63-2] at 129–30, 132 (questions 3, 9, 11, 12, 29–31). Cioppa did also state that he became aware in August 2014 that Shiba had filed a previous MSPB complaint for a previous termination that resulted in Shiba's reinstatement in 2010, but stated that he (Cioppa) had no knowledge regarding the specific allegations made by Shiba in his appeal to the MSPB. [65-1] at 6 (questions 6–8). Cioppa stated (again, in an affidavit) that he "consulted" with Martha Medina regarding Shiba's termination and provided her phone number. [63-2] at 131 (question 27). The affidavit also lists several people from "LER" (Labor and Employee Relations), two of whom Cioppa worked with and one of whom Cioppa "may have spoken to," during the process of terminating Shiba, as well as their phone numbers. [63-2] at 131 (question 28). (The affidavit does not explain what form any consultations took or what they involved; at most, by providing phone numbers, it may imply that Cioppa spoke on the phone with people he consulted.) Martha Medina was deposed; she testified that she did not remember whether she had any conversations with Cioppa about Shiba and did not recall having any conversations, and that she was not involved in the recommendation to terminate Shiba. [66-1] at 74 (43:8–15), 76-77 (45:12-46:8).

Among these facts, Shiba emphasizes Cioppa's statements (in affidavits from the USCIS EEO investigation; again, Cioppa was not deposed) that he (Cioppa) knew of Shiba's 2010 MSPB complaint and that he (Cioppa) consulted with Martha Medina on Shiba's 2014 termination. In particular, Shiba contrasts Cioppa's statement that he (Cioppa) consulted with Medina with Medina's testimony (at deposition in this case) that she did not remember whether she had any conversations with Cioppa about Shiba and did not recall having any conversations, and that she was not involved in the recommendation to terminate Shiba. (Shiba testified that Medina was his (Shiba's) supervisor and refused to let him take breaks or follow the restrictions his doctor placed on his return to work.) Shiba argues that Cioppa's statement is inconsistent with Medina's testimony, the inconsistency creates a fact dispute, and a reasonable juror could infer that his protected activity caused his termination.

Shiba's argument is not persuasive. As noted above, in the affidavits, Cioppa stated that at the time of his decision to terminate Shiba, he had no knowledge of Shiba's disability, Shiba's prior protected activity (prior EEO activity), or the circumstances surrounding the OIG investigation. [63-2] at 129–30, 132 (questions 3, 9, 11, 12, 29–31). Cioppa did also state that he became aware in August 2014 that Shiba had filed a previous MSPB complaint for a previous termination that resulted in Shiba's reinstatement in 2010, but stated that he (Cioppa) had no

knowledge regarding the specific allegations made by Shiba in his appeal to the MSPB.

Reading these statements as a whole, Cioppa knew that Shiba had filed a prior MSPB complaint and had been reinstated because of the MSPB complaint, but did not know that Shiba was disabled. The MSPB reviews numerous personnel actions under the Civil Service Reform Act of 1978. *Cf. Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 ("The CSRA established a comprehensive system for reviewing personnel action taken against federal employees.") (citation and internal quotation marks omitted). Knowledge of the existence of an MSPB complaint does not mean knowledge of the content or nature of the complaint. In other words, while Cioppa knew of Shiba's activity, he did not know that it was activity protected by the ADA and Rehabilitation Act.

In the analogous context of a retaliation claim, a plaintiff alleging retaliation cannot ordinarily survive summary judgment on causation without evidence of the decisionmaker's actual knowledge of the plaintiff's protected activity. *Cf. Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004); *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 755–56 (7th Cir. 2000). Granted, those cases involved situations where an employer's decisionmaker was not aware of protected activity at all, as opposed to situations where the decisionmaker was aware of a complaint but there was no evidence that the decisionmaker knew the content or nature of the complaint; so there is an argument that this case falls beyond the principle of those cases. But even assuming that this case is distinguishable from those cases and assuming that Cioppa knew that Shiba had engaged in protected activity, "mere knowledge" of an employee's protected activity does not necessarily support an inference that the protected activity caused the adverse employment action. *See Sanchez v. Henderson*, 188 F.3d 740, 747 (7th Cir. 1999); *Johnson v. Sullivan*, 945 F.2d 976, 981 (7th Cir. 1991). Again, all the evidence must be viewed as a whole, and the ultimate question is whether the evidence would permit a reasonable factfinder to conclude that Shiba's filing of the MSPB complaint caused the discharge. Cioppa's termination letter to Shiba shows that Shiba was terminated because he was a reemployed annuitant, employed at the pleasure of the appointing agency (i.e. at-will), had been on leave related to his receipt of workers' compensation benefits for many years, and had provided no services to the agency for years. All told, Cioppa's knowing that Shiba filed an MSPB complaint and was reinstated because of it would not permit a reasonable juror to conclude that the complaint caused the termination.

Cioppa's consultation with Medina—even taken together with Cioppa's knowledge of Shiba's MSPB complaint—does not tip the balance toward a genuine issue of a causal inference. Cioppa stated in an affidavit, without elaboration, that he consulted with Medina (Shiba's supervisor whom Shiba testified did not allow Shiba to take breaks as required by his doctors) as part of his (Cioppa's) decision to terminate Shiba's employment. Meanwhile, as Shiba notes, Medina testified at

deposition that she was not involved in the recommendation to terminate Shiba (and that she did not remember whether she had any conversations with Cioppa about Shiba and did not recall having any conversations). But even viewing all this evidence in the light most favorable to Shiba and assuming that the consultation occurred, Shiba points to no evidence in the record as to the content of that consultation. From the mere fact that a consultation between Cioppa and Medina occurred, a reasonable juror could not infer both that Medina spoke about the MSPB complaint and further, that Cioppa then terminated Shiba *because* of that MSPB complaint. This reasoning would not be a factually supported chain of inferences, but instead "impermissible speculation" that cannot withstand a summary judgment motion. *See Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 920–21 (7th Cir. 2022) (citing *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 960 (7th Cir. 2021)); *Sanchez*, 188 F.3d at 747 ("speculation does not create a genuine issue of fact") (citation omitted).

Shiba's only evidence to support an inference of causation is Cioppa's knowledge of the MSPB complaint and Cioppa's consultation with Medina. As discussed above, Cioppa did not know that Shiba was disabled or that he engaged in protected activity, only that Shiba challenged his previous termination and was reinstated. Even combining that fact with the Medina consultation, a juror would still have to engage in raw speculation about the consultation's substance without any factual basis on which to conclude that the consultation involved the MSPB complaint. Further, given the four-year gap between the MSPB complaint and Shiba's termination, in the context of the entire record, there can be no reasonable inference of causation based on temporal proximity. *Cf., e.g.*, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (per curiam) (20-month gap suggests no causality); *Igasaki*, 988 F.3d at 959–60 (two-month gap alone insufficient to defeat summary judgment on retaliation claim); *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) ("[W]e typically allow no more than a few days to elapse between the protected activity and the adverse action."). And again, the record (Cioppa's letter) shows that Shiba was terminated because he was a reemployed annuitant, employed at the pleasure of the appointing agency (i.e. at-will), had been on leave related to his receipt of workers' compensation benefits for many years, and had provided no services to the agency for years. Neither the evidence to which Shiba points nor the record as a whole creates a genuine issue as to causation.

Turning to the *McDonnell Douglas* framework: Under this framework, in the analogous context of a retaliatory termination claim, a plaintiff must show that "[1] after filing the charge [2] only he, and not any similarly situated employee who did not file a charge, [3] was subjected to an adverse employment action [4] even though he was performing his job in a satisfactory manner." *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Shiba has not made the requisite showing (at this stage, a genuine issue of material fact) because he points to no evidence that USCIS did not subject a similarly situated employee who did not complain to the same adverse action. *See McGowan v. Deere & Co.*, 581 F.3d 575,

580 (7th Cir. 2009) ("Because he is unable to demonstrate that a similarly-situated person not in the protected class was treated more favorably than he was, he cannot make out a *prima facie* case of racial discrimination.").

Even if Shiba had made out a *prima facie* case, under *McDonnell Douglas*, defendant has articulated a legitimate, nondiscriminatory reason for Shiba's termination. "If the plaintiff meets each element of her prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *McDaniel*, 940 F.3d at 368 (citation and internal quotation marks omitted). As noted above, "[i]t is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Naik*, 627 F.3d at 601 (quoting *Ineichen*, 410 F.3d at 961). Here, defendant has proffered a legitimate, nondiscriminatory reason for Shiba's termination: that he was terminated because he was a reemployed annuitant, employed at the pleasure of the appointing agency (i.e. at-will), had been on leave related to his receipt of workers' compensation benefits for many years, and had provided no services to the agency for years. No reasonable juror could conclude that this explanation was pretextual.

## C.    Count 2 – Hostile Work Environment

As the Seventh Circuit has explained:

> This court has not determined whether the ADA (and by extension, the Rehabilitation Act) encompasses claims of a hostile work environment. *See Conley v. Vill. of Bedford Park*, 215 F.3d 703, 712–13 (7th Cir. 2000). We need not resolve the question here. Even assuming Yochim could bring a hostile-work-environment claim, she must at a minimum demonstrate that the work environment was both objectively and subjectively offensive because of "severe or pervasive" harassment.

*Yochim v. Carson*, 935 F.3d 586, 593 (7th Cir. 2019). Further:

> "Title VII . . . forbids employers from requiring people to work in a discriminatorily hostile or abusive environment." *Boss v. Castro*, 816 F.3d 910, 919–20 (7th Cir. 2016). "When 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or [pervasive] to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id*. at 920 (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)). To survive summary judgment, Abrego must present evidence demonstrating "(1) the work environment was both

28

objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Id.* We consider the totality of circumstances, examining factors such as: "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Id.*

*Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018). Defendant cites cases from other districts for the principle that actions taken during an internal investigation do not constitute a hostile work environment. [62] at 21. Even assuming that they can (an issue the court need not reach), the totality of the circumstances to which Shiba points here—that his supervisors, Medina and Leach, denied him accommodations such as stretch breaks during his November 2010-January 2011 return to work (for example, Shiba testified that he had severe migraines and vomiting, but Medina told him not to take breaks and not to complain about pain), and that during the OIG investigation from September 2011 to the summer of 2014, OIG interviewed Shiba and various witnesses (including family members) and reviewed emails and bank records—do not rise to the level of severe or pervasive within the meaning of Seventh Circuit caselaw. Nor does the frequency of the conduct create a genuine issue as to whether the conduct meets the standard in Seventh Circuit caselaw, given the length of time (approximately four years, 2010-2014) over which the totality of the conduct allegedly occurred. Defendant is granted summary judgment on this claim.

### D.    Count 3 – Retaliatory Termination

As discussed above, Count 3 is unexhausted to the extent that it rests on USCIS employees' conduct during Shiba's 2010-2011 return to work.

As to all other aspects of Count 3, Shiba does not point to evidence from which a reasonable juror could conclude that the OIG referral and investigation or Shiba's termination were retaliation for engaging in protected activity (Shiba's 2010 MSPB complaint).

"Surviving summary judgment on disability-based retaliation requires showing (1) statutorily protected activity; (2) adverse employment action; and (3) causal connection." *Scheidler*, 914 F.3d at 544 (citing *Guzman v. Brown Cty.*, 884 F.3d 633, 642 (7th Cir. 2018)). To proceed past summary judgment to trial, Shiba must show a genuine issue of material fact for trial. Shiba contends that the OIG referral and investigation and his 2014 termination were retaliation for his 2010 MSPB complaint. Although Shiba engaged in protected activity and USCIS took materially adverse action against him (at least with respect to the termination; there is no need to reach whether the OIG referral and investigation were adverse

actions), defendant is entitled to summary judgment on causation. The analysis is the same as the analysis of causation as to the discrimination claim in Section I(B)(2) above. For the reasons given in that section, Shiba has not pointed to evidence that would allow a reasonable juror to infer the existence of causation between the MSPB complaint and either the OIG referral and investigation or his termination; he has not created a genuine issue as to causation under either the *Ortiz* or *McDonnell Douglas* method.

## II. **Claim as to ICE (Count 4 – Retaliatory Failure to Hire)**

In Count 4, Shiba brings a claim for retaliatory failure to hire with respect to a position at ICE. Shiba asserts that he engaged in protected activity by obtaining the 2010 order from the MSPB that permitted him to return to work with accommodations. [37] at 12 ¶ 54. In Count 4, however, he claims that ICE retaliated against him for that protected activity by not hiring him for an Enforcement and Removal Assistant (ERA) position after he had been tentatively selected. *Id.* Shiba contends that ICE's proffered reason for not hiring him was pretextual. *Id.*

The Secretary moves for summary judgment on Count 4 on the grounds that (1) the individual(s) who decided (or were involved in the decision) to rescind Shiba's tentative selection at ICE never knew of Shiba's protected activities, prior employment at USCIS, or the OIG investigation, and (2) Shiba has not identified a similarly situated employee who did not engage in protected activity and was selected by ICE for the position. [62] at 25. The court again analyzes the evidence as a whole and under the burden-shifting framework.

To prove retaliatory failure to hire, a plaintiff must show that he applied for a position and was qualified for it, that he engaged in protected activity, that the defendant did not hire him, and that there was a causal connection between the failure to hire and the protected activity. *Volling v. Kurtz Paramedic Serv., Inc.*, No. 14-cv-4423, 2015 WL 4197071, at *2 (N.D. Ill. July 10, 2015) (citing *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009)). (Again, at this stage, Shiba need not prove the claim, but must show a genuine issue of material fact on the contested elements.)

The Secretary does not dispute that Shiba has offered evidence of protected activity (his appeal before the MSPB, [63] at 20 ¶ 68) and materially adverse action taken by the employer (the ultimate failure to hire him, [62] at 25). Similarly to Count 3, the Secretary argues that there is no causal connection between Shiba's MSPB appeal and the rescission of his tentative selection for the ICE position. *Id.* The Secretary observes that the two relevant decisionmakers at ICE—Chicago Field Office Director Ricardo Wong and Supervisory Mission Support Specialist Angelina Ramos—did not know that Shiba filed a complaint with MSPB, had filed OEOI complaints, or had a pending lawsuit in district court. *Id.* at 25–26. Shiba points to

two facts that he argues warrant the denial of summary judgment: (1) both Ramos and Wong admitted they were aware of "significant derogatory" information on Shiba and (2) the suitability determination was taking too long. [66] at 17–18.

Assessing all the evidence cumulatively, neither these facts nor the record as a whole would permit a reasonable juror to conclude that ICE failed to hire Shiba because of his protected activity or to infer that ICE acted in a retaliatory manner. Shiba is correct that Wong and Ramos both knew that ICE's Personnel Security Unit had identified "significant derogatory" information that delayed his suitability determination. But this is not enough evidence to allow a reasonable juror to infer retaliation. There is no evidence in the record that Wong or Ramos knew what the "significant derogatory information" consisted of. *See* [67] at 24–28 ¶¶ 60, 62–63, 65–66. In fact, Wong and Ramos both testified that they did not know the content of the derogatory information. *Id.* at 27–28 ¶ 65–66. Neither knew of Shiba's protected activity or whether he was disabled. *Id.* Wong's decision to rescind Shiba's offer was based solely on the fact that Shiba's suitability determination had been pending for a year, "significant derogatory information" had been discovered during the suitability determination (although Wong and Ramos did not know what the information was), and, as Wong explained, the ICE field office needed to "fill that mission critical position quickly." As to the fact that the suitability determination took a significant amount of time, there is no evidence that Shiba's protected activity caused a delay in the suitability determination. If anything, the record evidence instead suggests that the delay was caused by concerns related to Shiba's alleged misconduct in his role at USCIS. *See* [65-1] at 67–70. The evidence as a whole does not create a genuine issue of material fact on whether ICE chose to rescind the tentative selection because of Shiba's protected activity.

Under the burden-shifting framework,

a plaintiff must first establish a *prima facie* case by showing that [1] he is a member of a protected class, [2] he applied for and was qualified for an open position, [3] he was rejected for the position, and [4] the position was filled with a person not in the protected class who [5] had similar or lesser qualifications than the plaintiff.

*Grigsby v. LaHood*, 628 F.3d 354, 358 (7th Cir. 2010) (citing *Jackson v. City of Chicago*, 552 F.3d 619, 622 (7th Cir. 2009)); *see also Jordan v. City of Gary*, 396 F.3d 825, 833 (7th Cir. 2005).

Shiba contends that because ICE has admitted that other suitability determinations did not take as long as his and that ICE allowed his application to sit for months even though a recommendation had been made, he has created a genuine issue of material fact as to whether he was disparately treated because of his protected activity. [66] at 18. Even taking those facts as true, Shiba still has

not alleged or pointed to evidence that ICE ultimately filled the position for which he was tentatively selected, let alone with someone of equal or lesser qualifications. He thus cannot make out the fourth and fifth elements of the *prima facie* case. *See Aberman v. Bd. of Educ. of City of Chi.*, 242 F. Supp. 3d 672, 693 (N.D. Ill. 2017). Even if he had, defendant has articulated a legitimate, nondiscriminatory reason for rescinding his tentative selection: Again, Wong's decision to rescind Shiba's offer was based solely on the fact that Shiba's suitability determination had been pending for a year, "significant derogatory information" had been discovered during the suitability determination (although Wong and Ramos did not know what the information was), and, as Wong explained, the ICE field office needed to "fill that mission critical position quickly." No reasonable juror could conclude that this reason was pretextual.

The Secretary's motion for summary judgment is therefore granted with respect to Count 4.

## CONCLUSION

The Secretary's motion for summary judgment [61] is granted. Enter final judgment.

Dated: August 5, 2024                     /s/ Martha M. Pacold